UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SOUTHERN TELECOM INC.,

                  Plaintiff,

      -v-

THREESIXTY BRANDS GROUP, LLC,

                Defendant.

------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:  1/12/2021

20-cv-2151 (LJL)

ORDER AND OPINION

LEWIS J. LIMAN, United States District Judge:

      Defendant, ThreeSixty Brands Group, LLC ("ThreeSixty" or "Defendant") moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the following reasons, Defendant's motion is granted in part and denied in part.

## BACKGROUND

      This case arises out of a license agreement between Plaintiff Southern Telecom Inc. ("STI" or "Plaintiff") and Defendant ThreeSixty Brands Group ("ThreeSixty" or "Defendant"). STI is a manufacturer of consumer electronics and accessories.  Dkt. No. 21 ("Compl.") ¶ 6.  STI sells its products to consumers through third-party retailers.  ThreeSixty is a limited liability corporation that owns the brand and trademarks THE SHARPER IMAGE and SHARPER IMAGE.  Dkt. No. 20 ¶ 2.

      In 2008, STI entered into a license agreement to use the trademarks "THE SHARPER IMAGE" and "SHARPER IMAGE" (the "Marks") in connection with its products.  *Id*. ¶ 7.  STI renewed the license agreement several times, most recently in 2013 (the "Agreement").  *Id*. Under the Agreement, STI was granted the non-exclusive right to use the Marks in connection

with multiple categories of consumer electronics.  *Id.* ¶ 9.  STI was licensed to sell its products under the Marks in multiple retail channels, including through stores such as Bed, Bath and Beyond, Best Buy, Office Depot, Costco, and Sam's Club.  The Agreement required STI to pay royalties on its sale of products sold under the Marks at rates between 3-6%.  *Id.* ¶ 11.  STI was also required to make quarterly minimum payments based on the amounts it projected it would earn.  *Id.*  The Agreement provided:

> Licensee acknowledges that the rights granted pursuant to this Agreement are non-exclusive and that nothing in this Agreement shall be construed to prevent or restrict Licensor from granting licenses to any third party to use the Licensed Mark in any manner or for any purpose, including, without limitation, the use of the Licensed Mark in connection with the Products in the Territory.

Dkt. No. 31 § 1.1(b).

The Agreement additionally provided for an application process by which STI could seek approval from the Licensor to use the Marks in connection with its products. The process proceeded in three stages: the "Concept Stage," at which STI was required to submit to the licensor a "drawing, storyboard or rendering of each product"; the "Pre-Production Stage," at which STI was required to submit an "'off-tool' working prototype of each Product"; and the "Production Stage," at which STI was required to submit "three (3) samples of such product from the first production run together with all final materials . . . to be used in connection therewith."  *Id.* § 3.2(a).  According to the Agreement, throughout this application process "Licensor shall have the sole and absolute approval, in Licensor's sole and absolute discretion, over all Products and all materials throughout the . . . three (3) stages of development and production."  *Id.*  Licensor promised to "use its commercially reasonable best efforts to respond within ten (10) business days after its receipt of any approval request."  *Id.* § 3.2(b).

The Agreement also granted to the Licensor discretion over the retail channels through

which STI could distribute the products it sold under the Marks:

> In order to maintain the reputation, image and prestige of the Licensed Mark, Licensee's distribution patterns shall consist solely of those retail outlets in the Territory whose location, merchandising and overall operations are consistent with the high quality of Articles and the reputation, image and prestige of the Licensed Mark and which have been approved by Licensor in writing.

*Id*. § 5.1.  Appended to the Agreement was Schedule B, a list of retailers who were pre-approved

by the Licensor.  The Agreement went on to state:

> Licensor may disapprove of any customer, even if such customer is listed as an approved account on Schedule B (or has otherwise been approved by Licensor in writing), if such customer diverts Articles or Licensor otherwise determines that such customer does not meet its standards.

*Id*. § 5.3.

> The Agreement included a general provision under the heading "Approvals":

> Licensor's approvals pursuant to this Agreement may be based solely on its subjective standards as to aesthetics based upon its requirements for and the reputation and prestige of products bearing the Licensed Mark and may be withheld in Licensor's sole discretion.  Also, Licensor's approval of any Articles for inclusion in, or of any materials of any kind for use in connection with, any particular collection of Articles shall constitute approval for inclusion or for such use in connection with such collection only.

*Id*. § 6.1

> Finally, the Agreement included a term under which STI could terminate the contract at

any time, resulting in a "Sell-Off Period:"

> In addition, upon Termination, Licensee immediately shall deliver to Licensor a complete and accurate schedule of Licensee's inventory of Articles and of related work in process then on hand ("Inventory").  Provided that this Agreement is not terminated by Licensor pursuant to ¶¶ 17.1-17.3, Licensee shall be permitted, for a period of 120 days following Termination, to sell-off the Inventory (the "Sell-Off Period"), provided that all such sales are made subject to all of the provisions of this Agreement.  All Sales Royalty due for sales of Inventory during the Sell-Off Period shall be accounted for and paid to Licensor monthly.

*Id*. § 18.2

The term of the Agreement was three years, until December 31, 2016.  Compl. ¶ 12.  By amendment, the term was extended through December 31, 2019, with STI granted a right to renew the Agreement at its sole option for an additional three-year term, until December 31, 2022, provided that STI: (1) notified the Licensor of its intent to renew by April 30, 2019; (2) had achieved sales at levels necessary to pay the minimum guaranteed royalties; and (3) was otherwise compliant with its contractual obligations.  *Id.*

At the time Plaintiff entered into the Agreement, Icon NY Holdings LLC ("Icon") owned the Marks.  *Id.* ¶ 8.  On or about December 30, 2016, ThreeSixty assumed ownership of the Marks.  *Id.*  Since that time, ThreeSixty has functioned as the Licensor of the Marks with respect to STI and has assumed the rights and obligations of the "Licensor" as defined in the Agreement. *Id.*

Prior to ThreeSixty's acquisition of the Marks, a company named MerchSource, LLC ("MerchSource") was the other licensee of the Marks in connection with the Products.  *Id.* ¶ 15. When Icon owned the Marks, both STI and MerchSource used the Marks on consumer electronics, but their respective product offerings did not overlap.  *Id.*  In 2016, the principals of MerchSource decided to acquire the Marks from Icon.  *Id.* ¶ 16.  MerchSource established 360 Holdings II-A LLC as an acquisition vehicle for MerchSource to obtain the Marks.  *Id.*  360 Holdings II-A was later renamed ThreeSixty.  *Id.*  ThreeSixty never has had an active business beyond owning the Marks and other intellectual property assets, and it has no practical existence separate from that of MerchSource.  *Id.*  The ThreeSixty personnel with whom STI interacts operate out of MerchSource offices and use MerchSource email.  *Id.*  Thus, whereas previously the owner of the Marks was independent of the licensees for the Marks, after 2016 ThreeSixty— as owner—and MerchSource—as licensee are now under common ownership.  Only STI is

independent of the owner of the Marks.

The acquisition of the Marks by a licensee of the Marks is the source of the ills of which STI complains.  Once ThreeSixty acquired the Marks, according to STI, it embarked upon a course of conduct to deprive STI of the business it had built under the Marks and to transfer that business to its affiliate, MerchSource.  *Id*. ¶ 17.  STI alleges that ThreeSixty breached its obligations to benefit MerchSource in several ways.  First, ThreeSixty repeatedly delayed and then denied for arbitrary reasons STI's product approval requests and used the information that STI submitted in its approval requests to develop competitive products to be sold by MerchSource under the Marks.  *Id*. ¶ 18-19.  It alleges that: "MerchSource is now selling under the Marks Products, including massagers, speakers, headphones, lighting and multiple other products that were directly copied from successful SHARPER IMAGE products developed and sold successfully by STI."  *Id*. ¶ 19.  It further alleges: "upon information and belief, ThreeSixty did not decline to approve various products developed by STI for sale under the Marks for aesthetic reasons, or to protect the SHARPER IMAGE brand, as it claimed, but to enable MerchSource to sell the very same products exclusively."  *Id*. ¶ 20.

Second, STI alleges that "ThreeSixty abused its right to approve the customers to which STI was permitted to sell Products under the Marks to accomplish the same ends."  *Id*. ¶ 21.  STI updated products at ThreeSixty's request and sold them to the retailers that ThreeSixty approved but reserved for MerchSource "other retailers to which STI could have and would have sold this product."  *Id*. ¶ 21.  "[O]n multiple occasions, STI was told by ThreeSixty that sales of Products bearing the Marks were not permitted to certain retailers like CVS, Dollar General, Kmart, Rite Aid, PCH and Morningsave, . . . supposedly because the image of SHARPER IMAGE would be harmed were goods bearing the Marks to be carried in such stores."  *Id*. ¶ 22.  But, STI

complains, MerchSource was permitted to sell goods bearing the Marks to those stores. *Id*. ¶ 22. STI complains that on at least one occasion, a longtime STI customer was told by ThreeSixty that it could supply Products bearing the Marks more cheaply if the customer purchased the products from MerchSource rather than STI. *Id*. ¶ 23.

Third, STI claims that ThreeSixty unreasonably refused to extend the Sell-Off Period. By notice dated April 24, 2019, STI elected to exercise its renewal option. *Id*. ¶ 13. But, effective February 14, 2020, after having complained about the alleged breaches of the Agreement, STI terminated the Agreement. *Id*. ¶ 25. This termination triggered STI's contractual rights to sell Products bearing the Marks during a 120-day Sell-Off Period. *Id*. ¶ 26. The COVID-19 pandemic intervened during the 120 days and the resulting emergency measures closed down STI's supply and distribution chains, as well as STI's business as a whole. *Id*. ¶ 27. It could not ship or receive product, nor could its customers or suppliers. *Id*. ¶ 28. STI requested an extension of the Sell-Off Period from ThreeSixty. *Id*. ¶ 29. ThreeSixty refused to extend it. *Id*. ¶ 30.

Based upon these allegations, STI asserts a single claim—for breach of the implied covenant of good faith and fair dealing. It alleges that ThreeSixty's conduct frustrated its ability to perform under the Agreement including its ability, under Section 1.4 of the Agreement, to "use its best efforts to exploit the rights herein granted throughout the Territory and to sell the maximum quantity of Articles therein consistent with the high standards and prestige represented by the Licensed Mark." *Id*. ¶ 24. Because of ThreeSixty's conduct, STI could not maximize sales and profits of Products bearing the Marks." *Id*. It seeks damages in an amount no less than $20 million for ThreeSixty's alleged breaches. *Id*. ¶ 36.

## PROCEDURAL HISTORY

STI initiated this action on February 20, 2020, by summons and complaint filed in New York State Supreme Court in the County of New York.  Dkt. No. 1.  On March 10, 2020, ThreeSixty removed this action to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446, based upon this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

On September 4, 2020, ThreeSixty filed the instant motion for judgment on the pleadings. Dkt. Nos. 26, 27.  Plaintiff filed a memorandum of law in opposition to the motion on October 2, 2020.  Dkt. No. 39.  On October 23, 2020, ThreeSixty filed its reply brief in further support of the motion for judgment on the pleadings.  Dkt. No. 40.

## STANDARD OF REVIEW

"The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).  Thus, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [P]laintiff's favor." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009) (per curiam)).  Defendant's motion must be granted unless the Complaint includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).  Likewise, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).  Put another way, the plausibility requirement "calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

When deciding a motion for judgment on the pleadings, a court may only analyze the content of the pleadings. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). The pleadings are deemed to include any document attached as an exhibit or any document that the complaint incorporates by reference. *Goldman v. Belden*, 754 F.2d 1059, 1065-66 (2d Cir. 1985). A contract not attached to the pleadings may be considered incorporated by reference where a plaintiff's claim relies solely on its content. *Cue Fashions, Inc. v. LJS Distrib., Inc.*, 807 F. Supp. 334, 336 (S.D.N.Y. 1992) (citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)).

## DISCUSSION

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)). "'This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 746 N.Y.S.2d 131, 135 (2002)). "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 461 N.Y.S.2d 232, 237 (1983). Accordingly, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties." *Id.*

The Court considers each of the three ways in which STI argues that MerchSource breached the implied covenant in turn.

8

A.     Product Approvals

STI argues, first, that ThreeSixty breached the covenant by pretextually denying all of STI's product applications.  The question is whether STI's argument can survive judgment on the pleadings in spite of the fact that the contract granted the Licensor "the sole and absolute approval, in Licensor's sole and absolute discretion, over all Products and all materials throughout the . . . three (3) stages of development and production."  Dkt. No. 28-1 § 3.2(a).  STI argues that the language of "sole and absolute discretion" in the contract did not absolve ThreeSixty of the requirement to comport itself in accordance with the covenant of good faith and fair dealing.

Historically, New York courts have held that the covenant of good faith and fair dealing applies to cases where a contract contemplates the use of discretion.  The starting point for the application of this principle is the New York Court of Appeals' decision in *Dalton v. Educational Testing Service*, 639 N.Y.S.2d 977 (N.Y. 1995).  In *Dalton*, the defendant, the Educational Testing Service ("ETS"), suspected a student of cheating on the Standardized Achievement Test ("SAT"), which it administered, and cancelled his scores.  According to the ETS's contract with test-takers, a person accused of cheating would have the opportunity to provide additional information.  *Id*. at 978.  The student provided a substantial body of evidence which went to show that he had not, in fact, cheated.  *Id*. at 979.  The ETS refused to change its ruling, and the student sued.  A jury found that the ETS had "failed to make even rudimentary efforts to evaluate or investigate the information" the student had provided and had thus "failed to act in good faith . . . thereby breaching its contract."  *Id*.

Before the Court of Appeals, the ETS maintained that a provision of the agreement which stated that the ETS had "the right to cancel any test score . . . if ETS believe[d] that there [was]

reason to question the score's validity" gave it unfettered discretion to cancel scores when suspicion of cheating arose. *Id*. at 978. The court disagreed, holding that the contractual provision carried with it the implied obligation, derived from the covenant of good faith and fair dealing, to consider "additional information" supplied by the test-takers bearing on the question whether someone else took the SAT for him. *Id*. The court noted that, under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the court of contract performance," and that, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id*. at 979. Even though ETS had the discretion to cancel test scores, it was a breach of the contract to cancel the test scores without going through the procedures that the contract called for. *Id*. at 980. ETS, by "refus[ing] to exercise its discretion in the first instance by declining even to consider relevant material submitted by the test-taker . . . failed to comply in good faith with its own . . . procedures, thereby breaching its contract." *Id*. at 981. Though the court did not state it explicitly, to hold otherwise would be to render the language in the contract regarding the appeal procedure surplusage. Further, to hold that ETS could cancel any test score in its own discretion would render the entire contract illusory, as receiving the score for which a test-taker contracted would become dependent upon ETS's whim.

In the wake of *Dalton*, a number of courts have held that, even where a contract permits discretion to a contracting party, that party may not exercise that discretion arbitrarily or irrationally. *See, e.g.*, *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 838 N.Y.S.2d 536, 538 (1st Dep't 2007); *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, 2005 WL 352137, at *5 (S.D.N.Y. Feb. 15, 2005); *Dweck L. Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004).

Recently, a New York court confronted a question similar to the one presented here, in *African Diaspora Maritime Corporation v. Golden Gate Yacht Club*, 968 N.Y.S.2d 459 (1st Dep't 2013).  There, the plaintiff racing crew sought to challenge the defendant for the America's Cup sailing competition.  *Id*. at 461.  Under the rules of the America's Cup, the defending champion had the right to choose who would challenge it in the following competition.  *Id.*  The defendant, reigning America's Cup champion, set forth an application process by which applicants paid $25,000 for the right to be considered for a spot in a competition that would determine who would challenge the defendant for the Cup.  *Id*. at 462. Under the terms of the application, "[the defendant would] review Defender Candidate applications and [would] accept those it [was] satisfied ha[d] the necessary resources . . . and experience to have a reasonable chance of winning the America's Cup Defender Series."  *Id*. The plaintiff's application was rejected and the defendant stated that it rejected the application because it was not satisfied that the plaintiff had the necessary resources to compete.  *Id*. Plaintiff sued for breach of contract, alleging that the reasons given for rejecting the application were pretextual, and that the defendant had deliberately sought to exclude the plaintiff from the competition.  *Id*. at 465.  The court held that the plaintiff's claim could survive a motion to dismiss, because the defendant was obligated by the implied covenant of good faith and fair dealing to perform a "good faith" review of the plaintiff's application.  *Id*. ("Even if the . . . agreement does not, on its face, set limits on the board's ability to refuse to approve the scope of work, the contract's implied covenant of good faith and fair dealing would prevent defendants from exercising that power arbitrarily.") (quoting *Peacock v. Herald Sq. Loft Corp.*, 889 N.Y.S.2d 22, 24 (1st Dep't 2009)).  "Although plaintiff [did] not have the right to be deemed a challenger, it [was] entitled to have its timely submitted application reviewed in good faith."  *Id*.

at 466-67.

ThreeSixty relies on the New York Court of Appeals' decision in *Moran v. Erk*, 872 N.Y.S.2d 696 (2008) for the proposition that the Agreement's use of the language "sole" discretion makes its exercise of that discretion impervious to challenge. But *Moran* does not stand for such a broad proposition. In *Moran*, two parties entered into a contract for the sale of real estate. *Id.* at 698. The contract was contingent upon approval by attorneys for the buyer and seller; if either attorney failed to approve the contract, the buyer's deposit would be returned. *Id*. After signing the contact, the buyers developed misgivings and instructed their attorney not to approve the contract. *Id.* Unable to sell the property at the original price, the sellers sued for the difference between the contract price and the ultimate sale price, arguing that the buyers had acted in bad faith and inconsistently with the purpose of the agreement by instructing their lawyer to disapprove the contract. *Id.* The Court of Appeals rejected the claim. The court quoted *Dalton* for the proposition that the covenant of good faith and fair dealing embraces the pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. at 699 (quoting *Dalton*, 639 N.Y.S.2d at 979). But it held on the facts of the case that it was not necessary to limit the exercise of discretion to accord the seller the fruits of its contract: "[T]he plain language of the contract ma[de] clear that the fruits of the contract were *contingent* on attorney approval, as any reasonable person in the [sellers'] position should have understood." *Id*. (internal quotation marks omitted). The Court held that the defendant had not "do[ne] anything which [would] have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. (quoting *Jennifer Realty*, 746 N.Y.S.2d at 135).

*Moran* thus stands for the more limited but still important proposition that where

application of the covenant of good faith and fair dealing would "negate a[n] expressly bargained-for clause that allows a party to exercise its discretion," *Paxi, LLC v. Shiseido Ams. Corp.*, 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009), it cannot be said that its application of the covenant is necessary to preserve the "fruits of a contract." The fruits of a contract do not include a benefit to which a party was not entitled. *Moran*, however, does not relieve the court of the need to determine whether the bargained-for clause allows a party to exercise its discretion and to examine the contract as a whole to determine, based on its language, whether the unfettered exercise of discretion would deprive a party of the fruits of the agreement and render a contractual promise illusory.

Rather, *Moran* requires the court to use the law applicable in all contract cases to determine the meaning of a contract term and then, after looking at both that term in isolation and the contract as a whole, to decide (1) whether the covenant would negate the terms of the bargained-for clause; and (2) if not, whether application of the covenant is necessary to preserve the fruits of the contract and prevent it from being illusory. The two questions are related. Courts presume that parties do not make empty promises. When the implication of a duty of good faith and fair dealing would be inconsistent with the language of a provision of a contract and is not necessary to make the agreement meaningful, the court will not invoke the covenant. But where, by contrast, it is necessary to read an obligation of good faith in order to avoid rendering a contract promise illusory—in the words of the cases, where necessary so as not to deprive a contracting party of the "fruits of the contract"—the courts will not hesitate to infer an obligation to act in good faith. A licensee granted the exclusive rights to sell the licensor's products, for example, cannot automatically relieve itself of the obligation to exercise that contractual right in good faith by the simple expedient of adding the language "sole discretion,"

if the failure to act in good faith would render the contract illusory. *See Advanced Water Techs. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 319-21 (S.D.N.Y. 2020). That is what was meant when Judge Cardozo long ago spoke of a contract right as being "instinct with an obligation." *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E 214, 214 (N.Y. 1917). No magic words can *ipso facto* and without review of the contract as a whole relieve a contracting party of that obligation.

The cases cited by ThreeSixty are not to the contrary. Although some of those cases use broad language or state that *Moran* should be interpreted "broadly," *In Touch Concepts, Inc. v. Cellco, P'ship*, 949 F. Supp. 2d 447, 472 (S.D.N.Y. 2013), none regard the language "sole discretion" as the be-all and end-all of whether the covenant of good faith and fair dealing applies. All read the contract as a whole to determine whether a limitation on the exercise of discretion would negate a term of the contract and then, depending on their reading of the contract, ask the question whether such a limitation is necessary to avoid rendering a contractual obligation illusory. In *State Street Bank & Trust Company v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004), for example, the plaintiff bank had extended over $100 million in credit to the defendant debtors. After the defendants defaulted on the debt, they sought to sell certain assets that the credit agreements explicitly denied them the right to sell in a "purported effort to repay at least a portion of the accelerated debt." *Id.* at 168. The plaintiff bank refused to consent to the sale unless it was paid $87 million of the sale proceeds and was provided new collateral and economic benefits. *Id.* The Second Circuit held that it was not a violation of the covenant of good faith and fair dealing for the plaintiff bank to deny the defendant debtors a right for which the defendants had not contracted: "Where a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent." *Id.* at 170.

14

Significantly, however, the plaintiff's exercise of its rights did not deprive the defendants of the fruits of the bargain for which they contracted—they had already received over $100 million in credit based on their promise to comply with the negative covenants regarding the sale of assets. *Id.* The bank thus "was justified in seeking to protect itself by conditioning its consent to the sale on the receipt of additional collateral and economic benefits." *Id.*

The court's decision in *Paxi, LLC v. Shiseido Americas Corporation*, 636 F. Supp. at 275 can be explained on a similar basis. There, a retailer of cosmetic products claimed that the manufacturer, who had agreed to sell the retailer its products in exchange for a commission was bound to continue to sell the retailer the products for an unspecified period of time into the future notwithstanding a contract provision that allowed "either party to terminate the arrangement at will and without cause" on five-days notice. *Id.* at 286. The plaintiff retailer claimed that if the manufacturer did not continue to sell the products the retailer would not be able to pay rent on its new retail location and would be evicted from that location. *Id.* at 281. The court held that the contract permitting the manufacturer to terminate the relationship, and a separate addendum by which the manufacturer agreed to the new retail location did not "impos[e] any good faith limitations on [the manufacturer's] absolute right to terminate the Retailer Agreement." *Id*. at 286. By signing an addendum that gave it permission to move without obtaining some modification of [the provision that gave the manufacturer the unfettered right to terminate the relationship], [the retailer] assumed the risk that [the manufacturer] would terminate the agreement before it had recouped its investment in the new space." *Id.* at 286. Imposition of a duty of good faith was not necessary to give the contractual promises meaning—the retailer was not required to invest in the new retail location and it enjoyed the fruits of the contract through the right (while the arrangement was in place) to sell and profit from manufacturer's products.

An indefinite extension of the Retailer Agreement would have given it a benefit for which it had not bargained and which was not necessary to give the agreement meaning.

The other cases cited by ThreeSixty are all to similar effect; they conclude that a requirement of good faith is not necessary to give the contract meaning.[1]  *See O.F.I. Imps. Inc. v. Gen. Elec. Cap. Corp.*, 2017 WL 6734187, at *2-*3 (S.D.N.Y. Dec. 29, 2017) (holding that, where debtor had not satisfied four conditions precedent to the release of creditor's lien, the implied covenant of good faith and fair dealing would not require the creditor to exercise its discretion to release the liens); *Overseas Priv. Inv. Corp. v. Gerwe*, 2016 WL 1259564, at *7 (S.D.N.Y. Mar. 28, 2016) (holding that the covenant of good faith and fair dealing did not apply to a provision of a contract which prohibited a defaulting debtor from selling assets without the creditor's permission); *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.* 2010 WL 3155176, at *13 (S.D.N.Y. July 30, 2010) (holding that the covenant of good faith and fair dealing did not require customer to be treated as "protected" in circumstances where such treatment was not necessary to give meaning to the contract and where it would have gone

---

[1] There is language in *Transit Funding Associates, LLC v. Capital One Equipment Finance Corp.*, 48 N.Y.S.3d 110 (1st Dep't 2017), to the effect that "the covenant of good faith and fair dealing cannot negate express provisions of the agreement, nor is it violated where the contract terms unambiguously afford [the lender] the right to exercise absolute discretion to withhold the necessary approval."  *Id.* at 114.  The Court does not read that language to raise two separate tests in the disjunctive or to hold that the parties can by language eliminate the covenant even where it does not negate express provisions by the simple expedient of using the language "absolute discretion." The result in *Transit Funding* is easily explained by another rationale: "Where a contract allows one party to terminate the contract in "its sole discretion" and for "any reason whatsoever," the covenant of good faith and fair dealing cannot serve to negate that provision."  *Id.* at 115.  *See also A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 382 (1957) ("where as here the parties have agreed to a termination clause, the clause has been enforced as written").

beyond the fruits of the agreement to which the defendant was a party).[2]

As then-Judge Scalia put it in *Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984), in assessing the application of the implied covenant of good faith and fair dealing, the context of a contract is critical:

> [T]he doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which, in the case at hand, constitutes "bad faith."  In other words, the authorities that invoke, with increasing frequency, an all-purpose doctrine of "good faith" are usually if not invariably performing the same function executed (with more elegance and precision) by Judge Cardozo in *Wood v. Lucy, Lady Duff-Gordon*, when he found that an agreement which did not recite a particular duty was nonetheless "instinct with . . . an obligation, imperfectly expressed." . . . Whether pursued under the rubric of "good faith" or the more traditional rubric (for most contracts) of "implied limitation," the object of our inquiry is whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power . . . could not be employed.

*Id.* at 1152-53.

The foregoing analysis demonstrates that STI has stated a claim that ThreeSixty violated the covenant of good faith and fair dealing in connection with ThreeSixty's refusal to approve STI's products.  Accepting the allegations of the Complaint as true, ThreeSixty's conduct deprived STI of the fruits of its agreement and would render its contractual promises illusory. STI paid good and valuable consideration to ThreeSixty in exchange for the opportunity to sell goods with the Marks.  It paid a minimum royalty amount and agreed to pay royalties on its sales in an amount between 3-6%.  It did so in exchange for something real from ThreeSixty—the opportunity to submit product ideas to ThreeSixty and, if ThreeSixty agreed with them and wanted the products to be manufactured, the opportunity to earn back the minimum royalty

---

[2] Several of the cases cited address the issue only in dicta.  *See, e.g.*, *In Touch Concepts*, 949 F. Supp. 2d at 472; *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333-35 (S.D.N.Y. 2010).

amount and make additional profits through sales of those products at least to the approved retail

outlets and, if ThreeSixty agreed, to additional retail outlets.

The allegations of the complaint make out a case that ThreeSixty deprived STI of the

benefit of its bargain and "engage[d] in conduct that . . . deprive[d] the other party of the benefits

of their agreement." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980).  After ThreeSixty

acquired the Marks and combined with MerchSource, ThreeSixty continued to accept product

submissions from STI but ceased to view those product submissions for their contents.  Rather, it

looked at them only for the identity of the company making the submission and—when it saw

the submissions came from STI—denied them solely on that basis and without looking at the

content, except—STI alleges—to appropriate for itself STI's product ideas and provide them to

MerchSource.  It thereby extracted value from STI in the form of the minimum royalty and its

product ideas without giving STI any opportunity to earn back the royalty and depriving STI of

the returns on its investment in the product ideas.  ThreeSixty was bound by the contract to

conduct a good faith application process and to perform a good faith review of STI's

submissions and retail applications.  Simply to refuse to consider STI's submissions because they

came from STI was a violation of the duty of good faith.

To hold that ThreeSixty could deny applications solely because STI submitted them

would be to deprive STI of the fruits of its contract and render the agreement illusory.  As

ThreeSixty candidly admitted at oral argument, its argument admits of the possibility that

ThreeSixty could have, from the day the Agreement was signed, accepted STI's minimum

royalties and product submissions and made an announcement to STI that it had decided no

longer to approve *any* STI product submission regardless of its content and regardless of

aesthetics simply because it came from STI.  ThreeSixty could have bypassed the process set

forth in the contract and announced that STI would have to comply with an entirely new process—regardless of the cost or the burden on STI—or else ThreeSixty would deny without any  consideration all STI product submissions (rendering the carefully-crafted language of the Agreement illusory).  Indeed, under ThreeSixty's reading, ThreeSixty could have announced that going forward—and in its sole and absolute discretion—it would approve an occasional STI product submission but only if it was allowed to take, without complaint from STI, the bulk of STI's product submissions and have them used by MerchSource with all profits flowing to MerchSource (and indirectly also to ThreeSixty) and none to STI.

Acceptance of STI's claim with respect to product approvals would not require the court to impose on ThreeSixty an obligation that would "negate a[n] expressly bargained-for clause that allows a party to exercise its discretion."  *See Paxi*, 636 F. Supp. 2d at 286.  It also does not render the language "sole and absolute discretion" illusory or meaningless.  It enforces the reasonable understanding of the parties.  *Tymshare*, 727 F.2d at 1153.  Reading the contract as a whole, *see, e.g.*, *N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term. . . .  Indeed, [a] contract should be interpreted in a way [that] reconciles all [of] its provisions, if possible.") (internal quotation marks and citation omitted); *see also Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."), it is clear that—as in *Dalton* and

19

*African Diaspora*—ThreeSixty's discretion with respect to product approvals was not unfettered. It was required to receive product applications from STI and to consider them for their content according to a prescribed three-stage process.  Each of those stages required STI to provide information about a proposed product for ThreeSixty to consider: a detailed drawing, storyboard or rendering at the Concept Stage, an off-tool working prototype at the Pre-Production Stage, and samples of the product from the first production run at the Production Stage.  At any stage in that process, ThreeSixty enjoyed discretion to stop the process and not allow STI to proceed to the next succeeding stage.  But what it did not have was the right to ignore STI's submissions entirely and to disapprove the proposal without regard to its content and solely because it came from STI.  In short, although the Licensor had broad "sole and absolute" discretion, that discretion would have to be based on its view of the application and could not disregard the application and focus solely on its author.

This reading of the Agreement does not convert ThreeSixty's "sole discretion" in Section 3.2 into the "reasonable discretion" or "sole but reasonable discretion" that is used elsewhere with respect to the laboratories at which products would be tested.  "A contract provision requiring the exercise of 'reasonable discretion' includes a promise not to act arbitrarily, irrationally, or without reasonable basis."  *Grandfeld II, LLC v. Kohl's Dept. Stores Inc.*, 83 N.Y.S.3d 66, 68 (2d Dep't 2018).  Section 3.2 does not require ThreeSixty's exercise of discretion to have a reasonable basis or require the Court to read out the duty of good faith and fair dealing to give the difference between "sole discretion" and "reasonable discretion" meaning.  Section 3.2 does something else and more for ThreeSixty than the language of reasonable discretion but not everything that ThreeSixty on this motion would have it do.  The "sole discretion" language permits ThreeSixty to exercise sole discretion whether to approve a

product based on the application.  If it bases a product denial based on the content of the

application, and its decision is genuine, and not pretextual, it must stand.  It need not be

reasonable or correct or even consistent with past standards.  What it cannot do, however, for

example, is to ignore the application and take the identical product manufactured to the identical

standards and sold to the identical retail outlets and say that it approves the product because it is

sold by MerchSource and not approve it because it is sold by STI.  *See Greenwood v. Koven*, 880

F. Supp. 186, 199 (S.D.N.Y. 1995) ("[The implied covenant of good faith and fair dealing]

mandates that an action authorized to be taken for a particular reason actually be taken for that

reason.").  Because STI alleges such facts, its complaint with respect to Product Approvals

withstands the motion to dismiss.

> B.     Retail Outlet Approvals

The Court reaches a different conclusion with respect to STI's allegation that ThreeSixty

breached the covenant of good faith and fair dealing by denying it approval to sell to certain

retail outlets while permitting MerchSource approval to sell to those same outlets, sometimes for

the same or similar products.  To the extent that STI alleges that ThreeSixty appropriated its

product ideas, gave STI approval to sell to certain retail outlets and not others, and then gave

those same product ideas to MerchSource for MerchSource to sell to other retail outlets, the

motion to dismiss is denied for similar reasons to those explained in Section A above.  The

product approval process in Section 3 is designed for STI to submit product approvals for STI to

manufacture and not to give ThreeSixty the design for products for ThreeSixty to manufacture

itself through MerchSource, cutting STI out of the process.  However, to the extent the

Complaint goes beyond those allegations and asserts a free-standing obligation on the part of

ThreeSixty to consider requests for retail outlets by STI in good faith (and not simply an

obligation not to take STI's product designs and give them to MerchSource to sell to those outlets), the motion is granted.  ThreeSixty retained for itself the right to determine which retail outlets STI could sell to and the right to deny STI access to retail outlets for no reason other than that it would be more profitable for ThreeSixty if MerchSource sold to those outlets, and not STI.

The question is close.  Both sides make fair arguments.  The Agreement, like all contracts written at the outset of a relationship does not clearly address all the events that would occur during the course of the relationship.  One of those events was the combination of MerchSource and the owner of the Marks.  But, on careful consideration, ThreeSixty has the better of the argument.  The allegation with respect to retail outlet approvals fails to state a claim for relief.

The Agreement addresses the retail outlets to which STI can sell in Section 5.1.  That Section and the Schedule B to which it refers and which is annexed to the Agreement lists a large number of retail outlets which are pre-approved for distribution.  No further approval by ThreeSixty is needed.  There is no allegation that ThreeSixty has refused to permit STI to sell to any of those outlets.

Section 5.1 addresses in its first sentence those additional retail outlets that are not pre-approved.  The provision has two separate elements: "In order to maintain the reputation, image and prestige of the Licensed Mark, [1] Licensee's distribution patterns shall consist solely of those retail outlets in the Territory whose location, merchandising and overall operations are consistent with the high quality of Articles *and* [2] may be withheld in Licensor's sole discretion."  Dkt. No. 31 § 5.1 (emphasis and bracketed numerals added).

Reading those provisions together, and striving to give meaning to each word and provision in the Agreement, the first sentence of Section 5.1 separately imposes obligations on STI and grants rights to ThreeSixty.  STI has an independent obligation to limit its distribution

patterns to certain categories of retails outlets—those in the Territory and which are consistent

with the high quality of the Articles.  Presumably it should limit the retail outlets for which it

seeks approval to those satisfying the criteria in the first clause and, were it knowingly to request

approval for retail outlets that did not satisfy those criteria, there might be consequences.  The

second clause of the first sentence of Section 5.1 grants rights to ThreeSixty and further limits

the retail outlets to which STI may sell products.  Regardless whether the retail outlets satisfy the

criteria in the first clause, ThreeSixty can deny approval to a retail outlet "in its sole discretion."

That exercise of discretion is not bounded by the first clause.  There is no allegation that

ThreeSixty breached Section 5.1.

Moreover, Section 6.1 provides that "Licensor's approvals pursuant to this Agreement [1]

may be based solely on its subjective standards based upon its requirements for and the

reputation and prestige of products bearing the Licensed Mark *and* may be withheld in

Licensor's sole discretion."  *Id*. § 6.1 (emphasis and bracketed numerals added).  Tellingly, the

first clause does not use the imperative "shall," which is used elsewhere in the Agreement and

which would have limited ThreeSixty's exercise of discretion with respect to additional retail

outlets.  And equally tellingly, the Agreement uses the disjunctive "and," suggesting that the

second clause is not restricted to what is contained in the first clause but adds to it.

That the first clause of Section 6.1 does not restrict ThreeSixty's exercise of discretion to

that based on "subjective standards as to aesthetics" is further confirmed by Section 5.1 itself.

As noted above, that section contemplates that in considering new retail outlets both ThreeSixty

and STI would consider its "location, merchandising, and overall operation."  Although, in some

instances, ThreeSixty and STI's consideration of those factors would overlap with aesthetic

considerations, it plainly would crimp the rights that the contract intended the parties to exercise

to limit that discretion to aesthetics.  The Complaint, for example, explains that before the Marks' acquisition by ThreeSixty, Icon used Section 6.1 to enforce market separation between STI and MerchSource.  STI could sell to certain outlets, while MerchSource could sell to others. Dkt. No. 21 ¶ 15. The Complaint does not criticize that conduct and instead embraces it.  But, reading the Agreement as STI would read it, that very conduct would be prohibited because it is not based on aesthetics.

Indeed, the Agreement elsewhere makes clear that the rights granted to STI are not exclusive and that Licensor retains the right to "grant[] licenses to any third party to use the Licensed Mark in any manner or for any purpose," including presumably the right—in Three Sixty's self-interest—to license others to use the Marks in retail outlets to which STI is not permitted to sell.  Section 1.1(b).  *See Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *5 (S.D.N.Y. May 10, 2013) ("In general, a party does not violate the covenant of good faith and fair dealing solely 'by acting in its own self-interest consistent with its rights under the contract.'") (quoting *Suther v. Airmen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006)); *Suthers. v. Amgen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006) ("Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract.  Indeed, courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable"); *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *30 (Bankr. S.D.N.Y. Dec. 1, 2016) ("Furthermore, courts have also held that a party does not breach the covenant of good faith and fair dealing when as is the case here, it was 'acting in [its] own self-interest consistent with [its] rights under [the] contract'") (quoting *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 726 (S.D.N.Y. 2014)).

Thus, the first clause of the first sentence of Section 6.1 is best read not as a restriction on ThreeSixty's exercise of discretion with respect to retail outlets but as a confirmation that the exercise of that discretion need not be based on objective factors but may be based on purely subjective ones and that those subjective factors can be as nebulous and as difficult to judge as aesthetics.  The allegations of the Complaint do not make out a breach of Section 5.1 or 6.1.

A restriction on ThreeSixty's exercise of discretion with respect to retail outlets is not necessary to preserve for STI the fruits of its agreement with ThreeSixty.  Even if ThreeSixty were to deny STI the rights to sell to any other retail outlets and to do so for purely self-interested reasons and not based either on the quality of STI's products or their suitability for those retail outlets, STI would have the right to sell to the accounts listed on the annexed Schedule.  Nor is a restriction on the exercise of that discretion necessary to give meaning to, and make non-illusory, any other language in the Agreement.  Unlike Section 3, with respect to the Development of Articles, Section 5 regarding Distribution and Customers does not contain a detailed application process that would be rendered illusory if ThreeSixty's discretion were unconstrained.  Thus, STI's allegations that ThreeSixty refused to permit STI to sell to retailers to which STI could have and would have sold its products, and that ThreeSixty declined to permit STI to sell to certain retailers to which it ultimately permitted MerchSource to sell, fails to state a claim for breach of the covenant of good faith and fair dealing.

C.     Sell-Off Period

Finally, STI complains that ThreeSixty acted in bad faith in not agreeing to extend the Sell-Off Period.  That claim is rejected.  The parties negotiated for a specific, and time-limited, Sell-Off Period following termination.  Under Section 18.2, "[p]rovided that this Agreement is terminated by Licensor pursuant to pars 17.1-17.3, Licensee shall be permitted, for a period of

120 days following Termination, to sell off the Inventory (the 'Sell-Off Period'), provided that all such sales are made subject to all of the provisions of this Agreement."  That provision presumably was the byproduct of negotiation, reflecting compromise by each side.  ThreeSixty— lacking any continuing relationship with STI and not being exposed to the risk of loss from the inability to sell Inventory—would have wanted a shorter time period.  STI would have wanted a longer time period.  The contract being clear that STI was entitled to only a 120-day Sell-Off period, ThreeSixty "had no obligation to grant [STI] an extension of time."  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994).

## CONCLUSION

ThreeSixty's motion for judgment on the pleadings is GRANTED with respect to retail outlet approvals and the Sell-Off Period and DENIED with respect to product approvals.

SO ORDERED.

Dated: January 12, 2021
     New York, New York
                                             _____
                                                LEWIS J. LIMAN
                                United States District Judge